In the Matter of the Estate of JOSEPH ANNA, Deceased.
CAROLINE BOHNER et al., Appellants; EDITH ANNA, as
Executrix, Respondent.

**Will — probate — evidence — will leaving property to woman
with whom testator was living in meretricious relations and
their illegitimate child rather than to his legitimate children
— question for jury whether testator was unduly influenced
by woman — section 347 of Civil Practice Act not applicable
where witness is examined in behalf of adverse party and not
in own interest.**

1. While moral depravity does not amount to testamentary incapacity
and testator had a right, if he so concluded without being subjected
to undue influence, to leave his property to the woman with whom
he was living in meretricious relations and their illegitimate offspring
rather than to his legitimate children, upon the trial of objections to
his will all of the circumstances bearing on the question of undue
influence will be carefully scrutinized and if sufficient evidence is
offered which, if unexplained, will permit an inference in favor of
contestants, it is error for the court to direct a verdict for the
proponent.

2. Section 347 of the Civil Practice Act, relative to personal transac-
tions between witness and decedent, has no application to a case where
the witness is examined in behalf of the adverse party and not as a wit-
ness in his own behalf or interest. It is, therefore, reversible error,
upon the trial of issues raised by objections to the probate of an
alleged will, to exclude, over objection from her own counsel, testi-
mony of the proponent in response to questions tending to show
her relations with decedent directly before she came to live with
him.

*Matter of Anna*, 223 App. Div. 806, reversed.

(Argued June 21, 1928; decided July 19, 1928.)

APPEAL from an order of the Appellate Division of the
Supreme Court in the fourth judicial department, entered
March 14, 1928, which affirmed a decree of the Oneida
County Surrogate's Court, entered upon the verdict of

a jury, admitting to probate a paper propounded as the last will of Joseph Anna, deceased.

*W. R. Pratt* and *Smith Johnson* for appellants. The surrogate erred in refusing to let the case go to the jury on the question of fraud and undue influence. (*Matter of Hermann,* 150 N. Y. Supp. 118; *Van Ness Will,* 139 N. Y. Supp. 485; *Rollwagen* v. *Rollwagen,* 63 N. Y. 519.) The surrogate erred in the exclusion of testimony. (*Harrington* v. *Schiller,* 231 N. Y. 278.)

*James F. Hubbell* for respondent. The surrogate rightly directed a verdict for the proponent on the question of undue influence. (*Matter of Kindberg,* 207 N. Y. 220; *Matter of Reuf,* 180 App. Div. 203; 223 N. Y. 582; *Matter of Cutter,* 175 App. Div. 647; *Matter of Powers,* 176 App. Div. 455; *Matter of Fleischmann,* 176 App. Div. 785; *Matter of Smith,* 180 App. Div. 669; *Matter of Allaway,* 187 App. Div. 87; *Matter of Bundy,* 217 App. Div. 607; *Matter of Rundles,* 216 App. Div. 658.) The surrogate rightly excluded testimony as to acts and conversations of petitioner and testator. (*Griswold* v. *Hart,* 205 N. Y. 384.)

POUND, J. Joseph Anna, the decedent, was a farmer in the town of New Hartford for more than thirty-five years. He died March 5, 1926, when upwards of seventy years of age. His wife had then been dead for some seven years. At the time of his death, the proponent, Edith Roberts, styling herself Edith Anna, was living with him as his wife although she had a husband from whom she had never been divorced. She had, in the spring of 1921, left her husband and family of young children and gone to live with Anna on his farm. She was then forty-three years of age. Shortly after she brought her oldest child, a daughter Alice, about fifteen years old, to live with her. Anna's son, William, commonly known as

Willie, a young man upwards of thirty years old, and his incompetent sister were living with their father when the proponent came there. The relations between father and children were amicable. In October, 1921, proponent had Willie arrested on a charge of rape upon the person of her daughter. He pleaded not guilty. He was never tried and he never returned to his father's home. He was not allowed to testify, over objections of proponent's counsel, whether he was guilty of the crime, although it was proper for the contestants to show that the charge was false. On February 16, 1923, Anna made his will, now offered for probate, in favor of proponent and a child born to her while she was living with him. In March, 1924, the incompetent daughter was committed to the Utica State Hospital, and afterwards to the Rome State School as a mentally defective person. Anna also had two married daughters upwards of forty years of age and a son who had not been heard from since 1911. The only provision he made in the will for any of his children was the creation of a trust of $2,000 for the benefit of the incompetent daughter during her life. He seems to have been worth about $25,000 at the time he made his will, but he had in 1922 taken title to two pieces of real estate in the name of himself and proponent as husband and wife, and in January, 1925, taken a conveyance of a third parcel of real estate in the same manner. He had also transferred a bank account to the name of Joseph or Edith M. Anna.

When the will was offered for probate, objections were filed by the son, William J. Anna, and the married daughters. The issues raised thereby of undue influence, mental incapacity and fraud were tried before a jury in the Surrogate's Court of Oneida county. The learned surrogate, at the close of the evidence, directed a verdict for the proponent on the ground that there was no evidence that decedent ever discussed the will with any one. A decree was thereupon entered admitting the will to pro-

bate. The Appellate Division affirmed by a divided court and the case comes here on the question whether the evidence of undue influence and mental incapacity was sufficient to require its submission to the jury.

As EARL, J., said in *Rollwagen* v. *Rollwagen* (63 N. Y. 504, 519):

"It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue*, in the sense of the law, when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case.  *  *  *  But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it. In 1 Jarman on Wills, 36, it is said: 'That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.'

"The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

As the same judge said in *Matter of Mondorf* (110 N. Y. 450, 456):

"Where such [meretricious] relations exist all the

1928.]                Opinion, per POUND, J.        [248 N. Y. 421]

circumstances attending the execution of a will which may be shown to have been induced thereby will be carefully scrutinized; but the right of a competent testator to make any disposition of his property which pleases him, although it may be unjust and unnatural, will not be curtailed."

The will was drawn by a reputable attorney of the city of Utica, since deceased. His stenographer testified that Anna was a client of the office; that he came alone to the office in regard to the will on two occasions, once when she took the dictation of the will from the attorney and afterwards when he executed it; that she and the deceased attorney were the subscribing witnesses. She made the usual formal proofs of competency and regularity. No other proof was offered by the proponent.

The contestants were able to show an extraordinary history of the relations of the testator and the proponent. In June, 1919, shortly after the death of Mrs. Anna, proponent was a witness for her husband in an action in the Supreme Court brought by him against Anna on a complaint charging him with assault, alienation of affections and criminal conversation. Her evidence is a part of the record in this case. She testified, in a bald and unconvincing way, that Anna had raped her on five separate occasions at her husband's home in the town of New Hartford in the years 1916–1917, and had been repelled on other occasions. He was at that time a neighbor and acquaintance. She swore that on the first occasion in July, 1916, he grabbed her and took her into the other room and had connection with her when the children were in bed at nine o'clock at night. The other instances were detailed in a like matter-of-fact way. She says her husband caught him on the last occasion and they went down the next morning to hire a lawyer and start the suit. Anna testified in his own behalf. He denied the accusations and the jury believed him. After he had won his case he told an old friend

that he was going to take it easy and leave his money to his children. In the spring of 1921 proponent came to live with the man she had thus accused, as his wife. She was not allowed, over objection from her own counsel as to the competency of the evidence, to testify in response to questions tending to show her relations with Anna directly before she came to live with him. This alone was reversible error. Section 347 of the Civil Practice Act, relative to personal transactions between witness and decedent, has no application to a case where the witness is examined in behalf of the adverse party and not as a witness in his own behalf or interest.

In 1923 Anna made this will in her favor after she had had his trusted and helpful son Willie arrested on the charge of raping her fifteen-year old daughter — a charge which seems to have been without foundation.

It is believable that proponent was led by her husband, who appears to have been by no means a model of morality, to testify falsely against Anna; that Willie did ravish her daughter, although she gave no evidence as to that; that testator became so attached to her that he took her in as his wife, drove out his own son in the belief that he had misconducted himself and gave his property to her and their illegitimate offspring because he wanted them to have it. He had a perfect right to do this if he actually reached his own conclusion to make such a disposition of his property without being subjected, not to influence merely, but to undue influence. (*Delafield* v. *Parish*, 25 N. Y. 9.) Moral depravity does not amount to testamentary incapacity.

But the relationships of the parties have much to do with this case. With this low standard of moral conduct we cannot be oblivious to the influence of greed rather than desire on proponent. The action of Roberts against Anna was inspired by the purpose to get money from Anna. It does not appear that he was ever proceeded against criminally or that her moral indignation was

greatly aroused. The civil action failed. In their subsequent relations proponent may have been the pursued or the pursuer. The evidence does not disclose. Was it love and affection or the craft of an adventuress that led her to leave her husband, worthless though he may have been, and her little children, and take up her abode with this old man Anna? The relation was as unnatural as it was meretricious. Was it the mother's protective instinct that led her to complain against Willie Anna and to refuse to let his father give bail for him, as she unquestionably did, when he was arraigned before the magistrate, or was this another manifestation of artfulness and greed? A jury had believed that she had perjured herself in an attempt to get Anna's money in her husband's lawsuit. She may have perjured herself when she swore out the warrant against Willie, in order to influence his father against him.

Anna's arteries were hardening. His mind was not strong or unimpaired. Senility was creeping upon him. If left to himself, influenced only by the legitimate arguments of those about him, he may have had testamentary capacity. If proponent accused Willie of raping her daughter, not to protect the child but to promote her own selfish interests, the jury might find in that act the exercise of undue influence upon an oversexed aging man; the act of a designing woman intent on driving out of the home in disgrace the natural object of his father's bounty. The woman would not allow the father to go on the son's bail bond. Was this mental coercion or was it the exercise of due and proper influence to restrain the father from an injudicious act?

The burden of proof upon the question of undue influence rested on the contestants. They, however, offered sufficient evidence which, if unexplained, made permissible an inference in their favor. (*Matter of Smith*, 95 N. Y. 516; *Smith* v. *Keller*, 205 N. Y. 39; *Matter of Kindberg*, 207 N. Y. 220, 228.) It was for the jury to

say whether or not the acts of Mrs. Roberts were " artful and cunning contrivances " (*Marx* v. *McGlynn*, 88 N. Y. 357, 370) which so overcame testator's independent volition as to induce him to do what he otherwise would not have done.

The order of the Appellate Division and decree of the Surrogate's Court should be reversed and a new trial granted, with costs to abide the event.

CARDOZO, Ch. J., ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur; CRANE, J., not sitting.

Order reversed, etc.